Romero, please approach the podium. Identify yourselves for the record. Grassman Avai, on behalf of Ramon Romero, for the State of Power Defender. Lori Rosen, Assistant State Attorney, on behalf of the people of the State of Illinois. Ms. Navai, did you want to reserve time for rebuttal? All right. Ms. Navai, you can proceed. Good morning, Your Honors. Good morning. Good morning, Counsel. May it please the Court. Today I will focus on Issue 3 regarding the denial of the right to present a defense, but I'm happy and ready to answer questions on all three issues in the brief. I'm sorry, what issue are you going to? The third issue, the denial of the right to present the insanity defense, but I'm ready to answer questions on all three issues. All right. Thank you. Go right ahead. Okay. The trial court erred in refusing to allow Mandy Romero, Mr. Romero's wife, to testify that out-of-court statements Romero made in 2009 when he first experienced a psychotic episode, was diagnosed with a major mental illness, involuntarily committed pursuant to court order, and treated with psychotropic medications. The court also barred statements that Romero made in the months and day of the 2010 incident. Very briefly, there were five such instances. There were two statements made by Romero following the August 24, 2009, birth of their son, in which he said there were people outside of his... So the judge barred it based on it was a hearsay statement. Is that correct? That is the... He didn't indicate directly if it was hearsay. It was a hearsay statement. It was not a hearsay statement. And what is your basis for saying that? It's relevant state-of-mind evidence. This is... For two years prior to the incident and it's a relevant state-of-mind? How? Actually, in insanity cases like this, courts have routinely recognized the importance of mental health history, dating back many years. Well, mental health history, but not hearsay statements. How are you getting around that one? I'm missing you there. Well, I think what is really important is the comparison of the 2009 psychotic episode with the incident that we have again in 2010 when he goes off his medications and experiences again that paranoia, the persecutory delusions. Okay, so you want the... I just want to make sure I understand your argument. You want the hearsay statements that the urine was going to kill him and he was running outside looking for Sandy or whoever it was that was going to kill him. You think that statement establishes his actions two years later? Not two years later. It shows his actions, his state of mind during the psychotic episode, during his diseased mind when he is feeling persecutory delusions. And it's quite important as a point of comparison between the two incidents because they're remarkably similar. His behavior at the time of the 2010 incident, I would say... when he shoots the police officer, when he pulls the disabled man out of the disabled vehicle, when he pulls the 70... what point are we at the same set of circumstances? I would say we would even if we go back actually the entire incident. But if we remember Mandy's testimony, she testifies that in the months leading up to the September 11, 2010 incident, he had gone off his medications and you mentioned the June 2010 statement. That's particularly important. Because one of... and I'll just... I'll answer twofold. There's... one of the disputes between the experts in this case was whether he was experiencing legitimate, non-bizarre persecutory delusions or that was Dr. Dinwiddie or as Dr. McCartney said, he was... had a rational fear of the Latin Kings gang. This testimony was relevant to show his behavior in a psychotic episode both at the time of the offense and when he was first diagnosed and was in the throes of mental illness as a point of comparison between the two incidents. And to answer your question directly, it seems as if his behavior began even in the weeks before this incident. Mandy testified that he was going from place to place, wasn't sleeping at their house. Well, he was also a leader in a gang that he had just pulled out of. You don't think that that showed an actual cognizant... that's a rational fear that there would be some retaliation for that. So there's going place to place. I think the trial court found that that didn't show delusion. It showed a conscious regard of he was in jeopardy. Could I interject for one moment? Sure. Weren't these statements considered, though, by the doctors? They were considered by one of the statements. One of the statements was specifically testified to the doctor. But that was in the context of explaining his diagnosis. There were no other lay witnesses. Mandy Romero was the only lay witness who could have testified to those statements. But were some of them... are you saying, though, that the doctors really didn't each have a complete, entire view of his history? I do, I do. I actually... What are the statements, if you can pinpoint, that Mandy made that the doctors really weren't cognizant of? It's not that there were statements that Mandy made... No, I'm sorry. That the defendant made. To Mandy. Correct? Correct. What were those statements that you believe that the doctors really didn't know about to formulate their opinions? Well, what I would say is that we have no indication of all of those statements. First of all, let me back up one second. The question is not so much for this issue. The question is whether he has a right to present that evidence in support of his insanity defense. Not whether it comes out one way or the other. There's certainly significant case law that says when someone is claiming that information wasn't really presented in one fashion, but if it actually comes in in another way, then that is not necessarily impactful, because the information has actually been before the finder of fact. I think that's a general principle of law. No, I agree with you. I understand. But I will tell you that in this instance, we do think it was impactful. If you will, it was prejudicial. Let me ask you this. The medical records are replete with this type of statements all over the place, so the doctors had opportunities to see these off-the-wall statements. Your Honor, it's not so much that the doctors had the ability to see this, but whether the trial court heard these statements. There was a dispute, Justice McBride, to go back to your point. It's not cumulative. There was a dispute between these two forensic psychiatrists over, as I said, whether he was experiencing legitimate, persecutory, non-bizarre persecutory delusions or whether he was impaled by a rational fear of a gang he left two years prior in 2008. And Mandy's statements, or I should say Ramon's out-of-court statements, lent color to Mandy's lay opinion of his paranoia, of his rambling, and so forth. In addition, and more importantly, I think what it did is it helped the fact finder make an evaluation between these two divergent positions. It informed the trial courts. It colored, if you will, the trial court's characterization. And the denial of those statements is not so much that the doctors didn't review them, but because the court didn't have that before them, it made it difficult to properly evaluate between these two experts. Do you really think that the court did not understand that both of these psychiatrists had a wealth of information before both of them when they came up with their opinion? I mean, do you think that these doctors were not aware of the statements that you're referring to? Justice McBride, I have a follow-up question. Are you referring to Issue 1, or would you like me to address it in the context of Issue 3? Well, I guess I'm back to the other question, is that if this information, it seems to me that the record suggests that the statements that he made, all of his activity, his complete history, going back a few years, was actually there, and that the doctors examined it, and then they each came to divergent views. I guess that's what I'm trying to say. And so I don't know that, I'm not sure that the trial judge, as a matter of fact, really wasn't aware of this information. No, he wasn't aware of this information in the context of a lay opinion. He didn't have that because he didn't let Mandy testify to that. Now, as far as... Are you saying Mandy's testimony was a lay opinion? Yes, I would say she's a lay opinion. What is the opinion? Her opinion of his paranoia, of his increasing rambling, of her characterizations, her conclusions about his behavior. Does a lay person give an opinion of paranoia? She can certainly testify to, I think, her observations of his behavior in the months leading up, especially in an insanity case, where it's recognized that that is not hearsay, it's state-of-mind evidence that's relevant for her. Were Mandy's medical records introduced into evidence? The reports were, they were actually, they were not introduced into evidence. People's Exhibit 94, which actually has a wealth of information, I think, was not introduced into evidence but was discussed during both the doctors' testimony. They were asked to comment on various parts. You know, I think Justice Gordon has a valid point there. Now, Mandy could testify to observations. She could testify to conversations. She could testify to things that he said, and that could be introduced. But I don't think that she could actually give an opinion that he was suffering from delusions or paranoia or anything like that. I mean, a lay person can say what they saw, what they heard, but then they can't go further as a doctor can to give an expert opinion on whether or not someone is suffering from a mental disease or defect. So I don't know that Mandy could ever say, oh, well, he was acting delusional or I think he was, you know, paranoid at that time. I don't think an individual could do that. The issue is not that was she allowed to raise that. In point of fact, Justice McBride, I think you're making my point. That's why it was really necessary that we needed to have those out-of-court statements. She doesn't offer an opinion. We just need to know what those out-of-court statements were. What was his state of mind? Did she testify about the incidents, though, right after the baby was born? She testified in paranoia. Go closer. Yeah. She testified about that, the incident right away regarding after the birth of their baby and that he wasn't sleeping. He thought that he didn't – wasn't there information about the urine on the bed and then she had to change the sheets immediately and clean everything and then there was a discussion about him? Or is this all coming in through the doctors, that he should go visit and stay with his mother for several days? No. Actually, you're talking about the one statement. There are five separate statements. But the one statement that we're talking about, the court initially allowed that statement in from Mandy and then reversed himself and then said move on, no more content of that conversation. But, yes, we know that she did change the sheets because he was insistent on wanting to change the sheets. Also, I want to – you know, right after all the things with the cars and robbing and whatever and the minister, he ended up in a bar, didn't he? Correct. And he was like sort of out on the town having a night out. You know, I mean, that kind of like – after this other behavior, I don't know what – that really is sort of – I don't remember seeing a case like this one where, you know, someone then went to a bar and met with some friends and hung out. And changed his clothing. I mean, he was cognizant that they could be looking for him for his crime spree and changed his clothing because he could be identified that way. Isn't that correct? No, Your Honor. That's your interpretation. The other interpretation that I think Dr. Dinwiddie testified to was that this was because of increasing paranoia. But just to back up, that whole day is – I know Dr. Nadkarni described it as goal-oriented, the flight after the incident. But in point of fact, I would say the reverse is true. And I think there was ample evidence by Dr. Dinwiddie about how it showed impulsivity and symptoms that are – that go together with bipolar affective disorder, psychosis. He goes from Chicago to a casino in Indiana where there's cameras. He wants to spend his money because the end is near. Yes, we said. Yes. He wanted to have some fun because he knew the police were going to come and get him. Right, but he was thinking the police were going to come and get him before. The important thing to note, though, is before this whole series of events takes place, he's shattering cell phones. He's moving from place to place. And I think that's why the denial of these out-of-court statements is so prejudicial because it informs our determination of exactly that. Was it a rational attempt at fear of the Latin kings? Well, there was no evidence that the Latin kings were out to get him, incidentally. Well, in fact, the party that he was at in Chicago Heights was a Latin kings party, was it not? It was not a Latin kings party. It was just a Latin kings area. He went to that area is my understanding of the testimony. Well, when the judge didn't allow these statements, are we reviewing that for an abuse of discretion since it's evidentiary material? Since we've captured it in terms of a constitutional right to present a defense, and I believe it did go to the right to present a defense, I would believe de Novo's review would be appropriate. However, under either standard, I think given a close case as this, where we have dueling experts and in particular where they fight as a matter of law, this is a close case, where we have two psychiatrists who, based on their evaluations of the defendant, came to divergent points of views, and the out-of-court statements would have informed that evaluation. I think as a matter of law, the denial of these statements tipped the balance against Ramon and was therefore prejudicial. I am not, I'm sure, as, let's say, aware of every detail in this record as you are. I know you have gone through it. I would be surprised, though, to conclude, if I went through it page by page, to find that these two doctors, in their review of this person's mental health history, were not aware of every single thing he did and said going back many years. That would surprise me. At the end, I would still come back to the idea that even though she may not have testified to what he said, I would find it almost shocking that the doctors who went through everything, I can't imagine that this information isn't already in the records that they reviewed. That's one thing. It wasn't just those two doctors. There were multiple exams, April of 2011, June 2011, January 2012, by Drs. Messina and Guzman, and they all found he was sane at that time. Is that correct? Yes, Your Honor, but the critical point is they didn't have the complete records. And I would like to go through the timeline with you. We would say that the state's argument that the evidence against Mr. Romero was overwhelming, it just doesn't hold up. Dr. Ned Kearney did not have essential pieces of the puzzle of his psychiatric history, so I would disagree with you. No, I'm saying, you may be absolutely correct. It would just be, I would only try to say, I know you're more familiar with the record than I am, and it would be surprising to me that the information that you feel that the court should have heard and didn't hear wasn't known or hadn't been made available to all the experts that examined him. What information did the doctor not have? Okay, thank you. Yes, Dr. Ned Kearney did not have the involuntary commitment reports. Well, he had the Tinley Park report. He didn't have the immediate River Forest two-day report. Yes, and actually not having those Riverside documents was quite critical, and I'll address Tinley Park in just a moment. Two days when he was in the throes of a psychotic episode, his first psychotic episode. Do you think the Tinley Park records detailed all the things from Riverside? I'm sorry, can you repeat that? So he's in, is it Riverside or River Forest? Riverside. Riverside for two days. He's immediately transferred to Tinley Park after that two-day period. He's in Tinley Park for a week. All those records from Tinley Park were reviewed by Dr. Ned Kearney. Interestingly, I actually went back and looked through all of the transcripts, and I noted that in fact Dr. Ned Kearney devalued, in addition to not seeing, having a firsthand look at Ramon in the throes of a psychiatric episode, he devalued the Tinley Park records. He said he didn't know where Ramon was prior to that and thought he had just presented himself to an ER and had been transferred to Tinley Park because the ER didn't have the facilities. In other words, he thought Ramon had been transferred there pursuant to factors external to himself. In point of fact, he was involuntarily committed. Riverside Hospital certified him for involuntary commitment, and then they transported him via ER emergency vehicle to Tinley Park where he spent a week. Tinley Park then, after he's released on October 8, 2009, transfers him or recommends that he continue outpatient treatment with the Helen Wheeler Center. He's treated at Helen Wheeler from October 13, 2009, all the way up until August 2010. Now, importantly, another piece of the puzzle that Dr. Ned Kearney was missing was the- Before you get into that, let's assume that I agree with you. Let's assume I agree with you. Sure, I can assume. What is it that's in the Riverside records that's so relevant? I think it's absolutely critical to see that one of the disputes between these two experts was whether Ramon even suffered a major mental illness. Dr. Ned Kearney discounted that, and I think precisely because he didn't see- My question is, what is in the records that would be so relevant to change the doctor's opinion? Tell me what was in the records that was so important. I did not have access to the Riverside documents. What I can tell you- You're telling us that he needed it, and you don't even know what's in it. No, that's not what I'm saying. I'm saying I didn't review those records. I can tell you what Dr. Dinwiddie said about those Riverside documents. They- that was- Well, don't you think it's critical that you would know that if you want to get a reversal here? I mean, we're supposed to reverse on the speculation and guess? No, I would say exactly the opposite. We do know the importance of the Riverside documents, and I'll explain why. That was the first time he presented in the throes of a psychiatric psychotic episode. He was then- that was the first time at age 24 that he's diagnosed with a psychotic illness, a major mental illness, and he's involuntarily committed. Not seeing those records is critical. And, again, I draw you back to Dr. McCartney's own testimony, in which he thought it was external factors that led him to be transferred to Timberlake Park. He discounted the significant and debilitating nature of Ramon's illness. And that's what those two- Let me stop you here. When somebody is admitted into any hospital, the diagnosis that is made is a preliminary diagnosis. Correct. He was only in this facility for two days. The ultimate diagnosis was made later in the other facility. The diagnosis was ultimately made later, but, again, as I said, if they're discounting the importance of the Timberlake Park records, but that's not the only document. I was about to say the other documents that Dr. Ned Carney lacked were the medication cycles from the Helen Wheeler Center. Helen Wheeler, again, is very important because it takes us almost all the way up to the incident, which was August 2010. The incident takes place in September 11th. Would the medication be relevant to a diagnosis of a person's sanity, the fact that they're taking a certain medicine? The fact that they're being prescribed psychotropic medications to control persecutory delusions would be highly relevant. That same medication that's used for that purpose is also used for a calming influence on people. That's what Dr. Ned Carney testified, that the jail utilizes these psychotropic medications. We're talking about a facility not associated with the jail. This was prior to the incident. But that's an interesting point. Dr. Ned Carney, he said he discounted or he had a skewed interpretation, I would say, based on the CIRMAC and the forensic clinical services evaluations of him, which in addition to being post the incident, were done without the benefit of the Timberlake Park records.  But secondly, he said that his belief was that Ramon did not benefit from the psychotropic medications that were given to him. When he was asked to pinpoint where in these records he couldn't do it, ultimately he said it's his belief that disciplinary problems happened in jail both on and off the medication. But the question is not whether Ramon acts out. Which, as Dr. Dinwiddie explained, could have been due to his independent personality disorder, which he also said goes hand in hand sometimes with a major mental illness like bipolar affective disorder. Rather, the question is whether the individual, his paranoia and his persecutory delusions subside on the psychotropic medications. And for that, we have Dr. Dinwiddie explaining that it did. So him not having the medication cycles, too, is quite relevant to his analysis of Ramon's full history. I think it skewed his interpretation just based on the records that he had post the incident. Ms. Amaya, I know you wanted to reserve some time for rebuttal, so why not wrap up this? Sure, no problem. If there are no further questions, then we would ask that an outright reversal and remand for NGRI proceedings on Argument 1, or alternatively a remand before a new judge on Arguments 2 and 3. Thank you. Thank you. Ms. Rosa? Thank you. May it please the Court, Counsel? In regards to Counsel's arguments on Issue 3, the comments or the statements that Mandy attempted to relay on the record that were from over a year prior to the actual incident of when the defendant was ultimately arrested were irrelevant. They were not at the time of the incident. They weren't that day. They were nowhere close in time to the incident, and they were irrelevant. And the judge rightfully and properly eliminated those statements from coming into evidence via Mandy. In addition, the statements that the judge sustained a month before the actual incident and the offenses that the defendant committed were also irrelevant. They were made, again, not at the time, anywhere near the time of the offenses. They were a full month prior, and they were statements that were not relevant to the events of the day. Let me ask you this. Even if they were relevant and allowed, would that have changed the result here? Which result? The result of the doctor's opinion? The result of the doctor's opinion or the result of the ultimate decision of the Court? Based on the record, I don't think that they would have changed either. Why is that? Well, I think that despite the fact that the judge did sustain some of the comments that Mandy was trying to get into evidence, the judge actually allowed a full and detailed and extensive testimony from her about the circumstances surrounding each of the different incidences. So, for example, a year prior, she went into great, great detail about all of the defendant's behavior, the way he was acting. Yeah, didn't she testify that right after the baby was born, for the first five days that she was recovering, he freaked out a little, paced around the room, looked out the windows. When she was discharged from the hospital, you know, he wouldn't drive her home. Then she actually testified that he was, quote, very paranoid and thought people were coming after him. She didn't believe anybody was coming after him, but she knew that he had been a previous gang member. Then she testified that he would not let her take their son to the home, and that she testified they went to the mother's house. And then she testified about how he couldn't sleep, and he was pacing, and that he was treated for anxiety. And then she said, and this was in the record, he needed to see a psychiatrist. He wasn't acting normally. She thought he had snapped. So, and then she said she tried to get him to get an appointment with a psychiatrist, but couldn't because he got worse. So, I mean, I don't know, even if the statements didn't come in, she was actually testifying about really not only his conduct, but obviously remarks that he made. That's correct, Your Honor. And so what are these, I mean, aren't these statements sort of in the record, or the events that surrounded the? Yes, Your Honor, and to answer Justice Gordon, it all ties in. There is zero prejudice because she was allowed to extensively testify to not just all of the comments that you just went through from the record, but then the incident, or the testimony that she gave about a month prior, she went into full and extensive detail about that as well. And so the judge heard all, it was a bench trial, and the judge heard all of his testimony, extensive testimony in great detail about everything that she observed in terms of the defendant's behavior, his actions, and round about his comments. So it all came into evidence, and for that reason, the judge's findings wouldn't have been different, even if he had not sustained the three different or four different incidences where he actually sustained the testimony there. And for that reason, in addition, and just to reflect back on counsel's arguments additionally, regarding Dr. Nidkerny's testimony, which is what the trial court was basing ultimately its findings on, but Dr. Nidkerny actually gave testimony, and he reviewed over 600 pages of medical records, and I know that your honors were asking questions about whether or not these statements came in via the doctors, which is really the only relevancy of them, because the doctors ultimately are basing their opinions based on all of this information, including their interviews or social histories with the defendant's wife, with Mandy Romero. And Dr. Nidkerny testified that he reviewed every document but for the two days at Riverside, and when the trial court was making its findings and even asking questions, it talked about the different records and made a statement and comment about the different records that each of the doctors reviewed, and the only difference was the two days at Riverside that immediately preceded the Tinley Park hospitalization of the defendant. Other than that, as far as the Riverside, isn't it also clear in the record that she testified? She did testify quite a bit, and that just before the Riverside, she actually was at the train station. He was at the train station where she found him. Then she drove him to the L, told him to go to his mother's house in Kankakee. The next week, she testified that she learned the defendant was in a jail in Kankakee. She and the defendant's mother actually signed a petition to have him involuntarily committed to the Riverside hospital for evaluation, where he did go. But that was in the record. She testified that, testified she signed the petition. Then she testified he was there for two days before being transferred to Tinley Park, where he then spent, I think it was seven days. And he was prescribed two different medications. So, I mean, there's really extensive testimony from her, without necessarily going into, you know, every word he uttered. Correct, Your Honor. I agree, and based on the record, for that reason, I think that there was no prejudice suffered, even if I don't believe that it was error to exclude the statements by the trial court in the first place. But even if there was error, there was zero prejudice, because the defendant was entirely able to present his defense in regards to the testimony from his wife. She was really, truly almost unlimited in the extent of the details she went into regarding the year and a half since the son was born, all the way going up to some of her testimony from the day of, although she was not a witness to any of the events or the offenses that occurred. So there was no prejudice, and there was no prejudice suffered. And for that reason, the trial court did not abuse its discretion initially. I don't believe there was error, but I also don't believe there was prejudice to show that there should be any reversal in this case on this issue. Also, counsel also argued about similarities in the behavior and explaining that the incident prior showed how the defendant potentially acted on the day of the offenses. And, again, the insanity defense really applies only to the time of the offense. So the behaviors a year earlier or a month earlier had no relevancy in terms of Mandy Romero's testimony about what happened that day. Well, I don't think counsel was bringing it up to refute any allegation that he was malingering or that he was just making up that this was all due to manic behavior, because he clearly had some odd behavior in the past. Yes, Your Honor. And so, again, the testimony would have been relevant in regards to the doctor's testimony, because the doctors are basing their findings and their opinions on all of the information. But wouldn't it make the trial court more amenable to the defense's expert if he also heard the testimony of his wife, who had been observing his behavior over a period of time? Certainly possible, but the wife was allowed to testify extensively in great detail about all of that behavior. And so she was able to get that all out and present the defendant's defense in that regard as a layperson making those observations to support, in whatever capacity the defendant wanted her to, the ultimate opinions by the doctors. Also, Your Honors, to highlight, to reflect again on counsel's arguments about the records that the doctors reviewed, and I just wanted to be clear that Dr. Nankarney, there's nothing in the record to show that he failed to review all of the records but for those two days at Riverside. In regards to the medication and whatnot, his testimony wasn't that he did not know about the medication. It was that he had reviewed 600 pages of documents. He came up with an ultimate opinion based on that. But when he was at trial and they were asking him very specific information, details about at what point, at what time the defendant may or may not have been prescribed a particular medication, he did not have that information on the tip of his tongue at that time. So the testimony was not that, oh, I don't know, I have no idea. But when you read it in its entirety, you'll see that Dr. Nankarney was really testifying that at that given moment he couldn't spit out the details and say on this date he had this medication. But his opinion was based on his reading of the entire record and all of the information he was given, which was inclusive of the medications that the defendant was prescribed on and off for many months. Was he on medication at the time of the trial? I think he was off his meds at the time of the trial. And I think that was part of the record as well. Journalist counsel did not argue in regards to issues one and three. I don't know if there are any other questions in regards to the third issue. But if not, I would just emphasize that, again, I don't believe that the trial court committed error. I think that the minimal statements that were, or the testimony that was limited was not relevant, at least in regards to Mandy Romero testifying, and that even if there was error, it certainly did not prejudice the defense because they were fully, fully entitled and allowed to present a very detailed and extensive defense in regards to all of Mandy Romero's observations, starting at the time that the baby was born through the time of the offense. And I would ask that the people would rest on the brief, on the arguments in the brief, and ask that you affirm. Thank you, Ms. Rosen. Thank you. Ms. Navarro. Just a few points. Beginning first with a clarification. I have transcript right here from Dr. Nadkarni's testimony. He repeatedly says, these are questions, I'm just going to go through them quickly. They're on page QQQ92 all the way to QQ94, I believe. No, I'm sorry, QQ95. And it's not that he doesn't remember. He says, I don't know. Prior to being Tinley Park, where was he in relationship to the mental health professions? I don't know. Do you know where he was involuntarily committed? I do not know that he was. What happened at Tinley Park? Mr. Romero was brought complaining of paranoia, of gang members. That is incorrect. Then he's asked repeatedly, he doesn't have the exact dates of treatment for Helen Miller, and he doesn't have any information of medicine. That's on page QQ94. He also did not have, by the way, the August 27, 2010 Bradley Police Department report. That's just a few weeks before this incident, when Mandy was so distraught about his behavior, Ramon's behavior, that she contacted them for help. But irrespective of that, even if we assume that Dr. Ned Kearney read every single document that Dr. Dinwiddie did, the error is still prejudicial. State itself conceded to your question, Justice Burke, that it could have tipped the balance against the defense if these questions had been brought in. These questions and these statements, these out-of-court statements, their relevancy is not whether the doctors had this information, but whether the trial court had this information and how it then determined between the two doctors and their differing points of views. Could I ask you something on this very last suggestion here? Sure. Now, if the issue were these statements should have come in because an expert can rely on any of them, absolutely. It wouldn't be hearsay, and even in the general sense, an expert can always testify about statements someone made if it would normally be used in arriving at an opinion. Any kind of person, an expert, can always review that. Do you believe there's actually any authority for an exception to the hearsay rule involving a layperson? Absolutely. What is it? What does Vanda say? I'll quote from it if you'll let me. When a defendant's sanity is an issue, great gratitude is allowed in admitting evidence relating to a defendant's mental state because to determine sanity you cannot take an isolated cross-section of a single series of acts and myopically examine it within the narrow confines of the date set forth in the formal charge. Okay, wait. Do you remember if in Vanda that the statement was being introduced by a layperson? Yes, actually, the mother. What did she say? What did she not say? They wanted to, actually what they wanted to do was bring in letters that the defendant had written to his mother, to his attorney, and the court did not allow it, and Vanda said that was improper. It is not hearsay. It is relevant state-of-mind evidence. They did reverse. They did not reverse, and I'll tell you why, and it's the distinction between this case and that one. The mother did testify in that case. In this case, we have an expert who testifies, and he only gets out one of the five statements that we're talking about, and he does not talk about Sandy, the neighbor in 2010, and that's relevant because it shows that Mr. O'Meara's fears were not limited to the Latin kings but were extensive and related to his mother, his mother-in-law, neighbors, random people that are not limited, and that's why it tipped the balance against Ramon when the court limited these statements. Wasn't it very obvious from this record that he had this fear that his own wife was trying to poison him with their son's urine? That was in 2009, so there are statements that relate to the day of the incident and I'd like to direct your attention to page 15 of Dr. Dinwiddie's report, People's Exhibit 94. The day of the incident, what's the statement you're looking at? The statement there were two. He called her. She said she characterized him as rambling but wasn't able to go into the content of that statement, so you can't judge her opinion of his rambling. So it's about the divorce, and in addition to that, and People's Exhibit 94, Dr. Dinwiddie makes note of the fact that he also accused Mandy of trying to hire someone to kill him. So again, he's experiencing some of the same symptoms prior to this incident. Dr. Dinwiddie wasn't aware of any of this. Is that what you're saying? No, Dr. Dinwiddie, it's not a matter of Dr. Dinwiddie. This wasn't testified to. It's in his report, though, and I'm just offering that as an explanation of why her testimony on the day of the event. So Dr. Dinwiddie's report contains the hearsay statements or the statements that were made? That statement, but it was not introduced into evidence. It was just used in the examination of the two witnesses. Okay, so Dr. Dinwiddie actually had the benefit of these statements. Is that accurate or not? That is accurate, but the court did not. The question is whether the court had those documents, reviewed those documents, and how those documents may have tipped the balance in favor of the state against Mr. Romero when they limited those documents, which the state, I believe, conceded saying it could tip the balance. Indeed it did. So as I've noted, the relevancy is not just the doctors, but whether the court was privy to this information, whether this information came out. In a closely balanced, and again, we have a closely balanced case. Whether you find that Ned Carney read or didn't read, it's a battle of the experts. It was a heated back and forth. They disagreed on major points, and Mandy's testimony would have tipped the balance in favor of the defense, and that's why we argue it was reversible error. Thank you. Thank you, Ms. LeBlanc. We'll take the matter under advisement, and we'll issue a ruling as soon as possible. Thank you both. You did a good job.